IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NNAMEKA NWAGBOLOGU,

      Plaintiff,

vs.                                                                           Civ. No. 99-1193 WWD/DJS

REGENTS OF THE UNIVERSITY OF NEW
MEXICO and SHERYL PATTON,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before this Court upon Defendants' Motion for Summary

Judgment, filed January 2, 2001 **[docket # 54]**.[1]   Several parties and claims have been dismissed

from this lawsuit.  The remaining claims are:  Title VII of the 1964 Civil Rights Act against the

Regents of the University of New Mexico and  42 U.S.C. § 1981 and § 1981a against Sheryl

Patton ("Patton") [see docket #60].  Having considered all the pleadings, memoranda and other

materials submitted by the parties, as well as the applicable law, I find that Defendants' motion is

well-taken and will be granted.

## BACKGROUND

Plaintiff ("Nwagbologu") worked as a staff pharmacist with the University of New Mexico

Hospital ("UNMH") Pharmaceutical Department for eighteen years.  Defendant Patton, inpatient

supervisor at UNMH, was Plaintiff's immediate supervisor.  Plaintiff contends that he was

---

[1]  Summary judgment on all of Plaintiff's claims was granted to Defendants Achusim and
Caselnova [docket # 61]. Claims against Defendants Boule, Moser and Patton in their official
capacity on Counts II, III, and IV (§ 1981a and § 1981 ) were dismissed without
prejudice on Eleventh Amendment grounds [docket # 58].  Plaintiff has conceded that Defendants
Moser and Boule should be dismissed from the lawsuit, and that claims arising under § 1983
against Patton should be dismissed.   Resp. to Sum.J. at 5, ¶¶ 1, 3 & 4.

wrongfully terminated, that his race, black, was a motivating factor in the personnel decision to terminate and that the personnel decision was unduly harsh.  Plaintiff's claims rest on disciplinary measures that were taken which led to his termination.  Plaintiff does not dispute the following set of material facts describing these incidents.

*Errors Leading to Disciplinary Action*

On March 23, 1998, Plaintiff was suspended for one day without pay for seven different incidents involving poor customer service, inappropriate interaction with peers and unprofessional behavior.  Ex. G.[2]  These incidents occurred between November 1, 1997 through December 27, 1997.  Plaintiff grieved his one-day suspension through arbitration; his request for relief was denied.  Ex. H.

On September 15, 1998, Nwagbologu was suspended for three days without pay for an incident that occurred the previous month.  Plaintiff was responsible for preparing a chemotherapeutic medication for a young girl who was on an investigational protocol.   He passed on the responsibility to the charge pharmacist after making meager attempts to locate the drug.  As a result, because the girl missed an intravenous dose of the medication, she was removed from the study.  Ex. I.   Plaintiff grieved this suspension.  Upon review under the guidelines of the collective bargaining agreement ("CBA") between Plaintiff and UNMH, it was determined that a "system failure might have played a role" in the incident.   The discipline was rescinded by the director of pharmaceutical services for Plaintiff as well as for two other pharmacy employees who

---

[2]  Some of these incidents are:  on 11/19/97, two-hour delay on a timed medication, despite numerous calls from the unit nurse; on 11/27/97, throwing a stat request at co-worker and refusing to talk to that individual for the remainder of shift; on 12/27/97, when co-worker contacted Plaintiff about a drip needed for the Burn Unit ASAP, Plaintiff yelled that he'd do it if he could, and then hung up.  Ex. G.

had been disciplined, and administrative recommendations were made with the objective of preventing such failures from occurring in the future.   Exs. J, K.

On December 16, 1998, Plaintiff was again suspended for three days without pay for failure to request leave properly or in a timely manner; failure to inform his supervisor that another pharmacist was taking sick leave; and knowingly leaving the pharmacy shorthanded.   Ex. M.   Plaintiff was the pharmacist in charge on Saturday, December 5, 1998.   During the shift, one of the pharmacists, Larry Tannery, informed him that he had completed an employee absentee report and was starting his leave later that shift and would not be working the following day through Monday.   Plaintiff did not attempt to make calls to cover the shift or let the following shift know.   The staff did not realize they would be short-staffed until Larry did not arrive to work.  On December 5, 1998,  Plaintiff sent Sheryl Patton an e-mail informing her that he would not be able to work on Monday, December 7th due to the lack of a baby sitter, even though he was aware of this since December 3rd.   Plaintiff was also aware that Patton was not due back at work until Tuesday, December 8th.[3]   Plaintiff's grievance of this incident was denied.   Ex. as N.

As part of the list of undisputed material facts, Defendants include an incident which occurred on November 23, 1998 in which Plaintiff refused to sign forms acknowledging receipt of two inservices provided by his supervisor, Defendant Patton.   Ex. L.   Pharmacy employees attending inservices are required to sign these documents acknowledging attendance.   As a result of Nwagbologu's refusal to sign, a meeting was scheduled where he was allowed to bring his union representative.   Plaintiff signed the forms on November 23, 1998, the day before the

---

[3] Not only was Patton's schedule posted, but she regularly had Sundays and Mondays off. Ex. M at 2.   Plaintiff does not challenge these facts.   Patton stated in her deposition that the e-mail was sent five minutes after the end of her shift.   Ex. W at 156:18-19.

meeting.

Plaintiff does not dispute the facts of the November 23rd incident, but rather argues that they should be stricken, on the basis that they are not material to the summary judgment motion. I find this response improper because it offers a legal conclusion and does not raise a factual dispute. I also find it to be incorrect, since I consider Plaintiff's behavior to be material to the facts raised by Defendants to demonstrate that their assessment of Plaintiff's performance and conduct was based on motives that were legitimate, reasonable and not unlawful. According to UNMH policies and procedures, "uncooperative behavior" and "insubordination" (both of which may be used to describe Plaintiff's refusal to sign the document acknowledging attending inservices), are considered "just cause" for disciplinary action. See Ex. F at 2.

*Errors Leading to Dismissal*

On May 12, 1999, Plaintiff received a notice of contemplated dismissal from Patton at an hour long meeting at which the union representative and a member of the  human resources department were present.  The subject of the notice was a list of six specific medication errors that occurred between February 2, 1999 through March 30, 1999.  Ex. O.  Plaintiff did not respond to the notice within 24 hours as required.  On May 14, 1999, Plaintiff received a notice of final action by mail.  Ex. P.  This notice contains the same list of six medication errors and also a written description of Plaintiff's responses to the allegations set forth in the errors.

On February 2, 1999, Plaintiff prepared a chemotherapeutic drug in the wrong volume. Because there was a question of the strength of the solution upon checking the drug against the protocol, Ex W at 168:14-23, the error resulted in a four and a half hour delay in administration of the medication to the patient.  The second error occurred on February 19, 1999, when Plaintiff

allowed a large dose of Epogen to be administered.  Plaintiff prepared the mixture without

questioning the order.  The error was caught by another unit pharmacist.   Nwagbologu contends

no mistake occurred here because the dosage was not  that unusual[4] and because the order was

prepared by a physician.   Defendants maintain that pharmacists are routinely taught that it is their

responsibility to check orders for apparent errors of overdose.  Ex. W, 75:20-76:8 & 190: 14-21.[5]

The third, fourth and sixth errors were mislabeling errors which occurred on March 6th, March

12th and March 30th.  They were brought to Patton's attention when she came into work on

those mornings and found IV bags placed anonymously on her desk.   Plaintiff concedes that the

dispensing pharmacist attaches the label to the bag and then signs off on it, Ex. W at 363, and

does not dispute that the bags contained his initials.  Instead, his response to these errors at the

time was that someone else must have removed the labels from the original bags and placed them

on incorrect solutions.

        The fifth error listed on the notice of contemplated dismissal occurred on March 20, 1999

and involved Plaintiff's failure to monitor levels of an antibiotic, Tobramycin for a patient in the

intensive care unit where Plaintiff was working.  The drug level on the patient shot up in the

evening, but subsequent doses were not held, and the patient received the medication at levels that

---

[4]  The notice states that the "most aggressive dosing" of Epogen is 300 units/Kg.  The dosage on the order was for 40,000 units.  Ex. P.  According to William Troutman, Professor of Pharmacy, an overdose of Epogen is unlikely to cause toxicity other than the usual side effects of the drug (e.g., hypertension, nausea, rapid pulse).  Ex. X at 2.

[5]  Plaintiff does not dispute Defendants' Undisputed Fact ¶ 1, wherein it is stated (based on Plaintiff's statement in deposition) that "[a] pharmacist has a duty to make certain that all drugs delivered to patients are the correct drugs."

are considered toxic, equivalent to two additional dosages.[6]  Plaintiff concedes that the dosage should have been lowered, but contends that he was unaware of these levels.

Plaintiff does not challenge the accuracy of the description of the six errors.   He assumes responsibility for only the first error and does not acknowledge the existence of error for the second and fifth incidents.   He claims the evidence is "insufficient" for him to admit any responsibility for the third, fourth and sixth errors and also implies that someone else must have switched the labels on the IV bags.   Nwagabologu Aff., ¶ 4.   His claim for disparate treatment rests on the assertion that there was disparity in the discipline he received for committing these medication errors and that substandard work performance was a pretextual basis for his termination which he alleges was based on racial animus.   Plaintiff also claims that he did not have meaningful opportunity to discuss several of these alleged errors as they were occurring in March of 1999, according to hospital procedures.

## DISCUSSION

I address two threshold issues first before turning to the merits of Plaintiff's claims: whether Plaintiff's cause of action under § 1981 are precluded by the collective bargaining agreement between Plaintiff's union and UNMH; and whether Plaintiff's failure to amend his complaint precludes this Court from considering any issues surrounding his termination.

**I.      § 1981 Claims and the CBA[7]**

Defendants contend that the CBA between Plaintiff and UNMH waives Plaintiff's right to

---

[6]  Tobramycin overdose could lead to permanent kidney and otic complications.   Ex. X at 2.

[7]  Although Plaintiff pleads § 1981a and § 1981  in separate counts in the Complaint (Counts II and III respectively), § 1981a is the remedial provision for violations of § 1981.

pursue statutory remedies under § 1981.  Defendants argue that Plaintiff has not completely

exhausted his remedies under the terms of the CBA because it is still pending and that no contract

of employment exists except for the CBA on which to base a § 1981 claim.  These arguments are

not persuasive.[8]

Supreme Court law is clear that a plaintiff can still pursue redress for violation of federal

rights in a judicial forum, even if the claims are arbitrated.   See Alexander v. Gardner-Denver

Co., 415 U.S. 36 (1974).  Further, the statutory right to equal employment opportunities is

"separate and distinct" from rights created through collective bargaining   See Barrentine v.

Arkansas-Best Freight System, 450 U.S. 728, 737-38 (1981)(citing Alexander v. Gardner-Denver

Co., 415 U.S. 36 (1974)).  Therefore, the pendency of Plaintiff's arbitration proceeding does not

affect the viability of his § 1981 claim, since an arbitration award would not have preclusive

effective to the federal claim.   See Milton v. Scrivner, 53 F. 3d 1118, 1121 (10th Cir. 1995);

McDonald v. City of West Branch, 466 U.S. 284 (1984) (an arbitration award does not bar a

subsequent cause of action under § 1981) (citing McAlester v. United Air Lines, Inc., 851 F.2d

1249, 1254-55 (10th Cir.1988)).  Defendants' reliance on case law which holds that claims for

wrongful termination are preempted by a collective bargaining agreement is misplaced, as those

cases deal with issues in the context of state contract claims or enforcement of the collective

bargaining agreement itself.   See Reply at 4, n.1.

An employee can be required to arbitrate federal claims for employment discrimination if

he has contracted to do so.  See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35

_____

[8] The arbitration hearing was held on January 9, 2001.   The deadline for briefs was
February 23, 2001, thirty days after which the arbitrator was to render a decision.  Reply at 6, n.4.

(1991).[9]   In the case of a union-represented employee, a waiver of the statutory right to a judicial

forum for claims of employment discrimination must be "clear and unmistakable." Wright v.

Universal Maritime Serv. Corp, 525 U.S. 70, 79 (1998);  Shankle v. B-G Maintenance

Management of Colo., Inc. 163 F.3d 1230, 1232  (10th Cir. 1999).[10]   While the CBA at issue in

this case contains a general anti-discrimination provision, Ex. E at 2, it does not constitute what I

consider to be a "clear and unmistakable" waiver of Plaintiff's right to a judicial forum for his §

1981 claim, particularly given the Supreme Court's approach to preserving the separateness of

federal statutory claims.

Defendants contend that Plaintiff cannot pursue a claim under § 1981 because no contract

of employment exists except for the CBA.  However, this issue need not be resolved, because

Plaintiff's §1981 claim is viable even if there is no separate contract of employment between

UNMH and Plaintiff.   This Circuit has declined to adopt a narrow interpretation of §1981 which

requires an express contract as a basis for a cause of action under the statute.  See Perry v.

Woodward, 199 F.3d 1126, 1132 (10th Cir. 1999).  In fact, relying on New Mexico law, the

Tenth Circuit has held that an at-will employee could bring a wrongful termination claim against

---

[9]  Although Gardner-Denver and Gilmer appear to be at odds, they are distinguishable.
See Livadas v. Bradshaw, 512 U.S. 107, 128 n.21 (1994); Gilmer, 500 U.S. at 26, 35.  The issue
in Gilmer was the enforceability of an agreement to arbitrate, whereas Gardner addressed the
question of whether arbitration of contract-based claims precluded subsequent judicial resolution
of statutory claims.

[10]  The "clear and unmistakable" standard may not apply to situations involving individual
agreements where the waiver is not union-negotiated.   See Williams v. Imhoff, 203 F.3d 758,
763-64 (10th Cir. 2000) (recognizing that the Wright court "indicated that a 'broad arbitration
clause in an individual agreement could 'embrace federal statutory claims, while the identical
clause in a  CBA would be construed in a more narrow fashion'") (citing Wright at 80-81).  In
this case, the "clear and unmistakable" standard would apply.

an employer under § 1981, finding that the relationship consisting of the employee's rendition of services in exchange for the employer's payment of wages was contractual, even though it was at-will. Id., (citing Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726 (1988)); see also Hampton v. Dillard Dep't Stores, No. 98-3011 (10th Cir. Kan, 4/24/2001) (recognizing that the statute has been applied to discrimination claims arising in the retail sector and restaurant industry, when a contract has been established).   Thus, I find that the CBA does not preclude or render premature Plaintiff's filing of his § 1981 claim in federal court.

## II.  Timeliness of Title VII Termination Claim

Defendants claim that Plaintiff's termination issue under Title VII is time barred because the right to sue letter on the charge related to his termination was issued after Plaintiff filed this lawsuit.  See 42 U.S.C. § 2000e-5(f)(1) (suit must be filed within ninety days after EEOC provides notice of right to sue).

Plaintiff filed two charges of discrimination with EEOC.  He filed the first on December 8, 1998, alleging race discrimination and retaliation for the time period between March 12, 1998 to November 17, 1998.  Ex. S.   Plaintiff received the right to sue letter on July 19, 1999, two months after he was terminated.   On June 25, 1999, Plaintiff filed a second charge of discrimination with the EEOC based on his termination.  Ex. T.  He filed the present federal lawsuit on October 15, 1999, before receiving the suit letter on that second charge.  Defendants contend that Plaintiff's failure to amend the complaint to include the termination claim after the right to sue letter on that claim was issued cuts off his right to raise it now in this lawsuit. Plaintiff contends that he first knew of the right to sue letter on January 20, 2001 when his lawyer showed him the letter.  His lawyer claims first hearing about the letter from Defendants'

memorandum brief and that he first received a copy of the letter the same day he showed it to his client.  <u>Affs. of Plotsky and Nwagablogu</u>.

In order to be timely, a claim under Title VII must be filed within 90 days of the claimant's receipt of a right-to-sue letter.  <u>Sherlock v. Montefiore Medical Center</u>, 84 F.3d 522, 525 (2d Cir. 1996); <u>Stallworth v. Wells Fargo Armored Serv. Corp.</u>, 936 F.2d 522, 524 (11th Cir. 1991); <u>St. Louis v. Alverno College</u>, 744 F.2d 1314 (7th Cir. 1984).   Defendants are correct that normally it is assumed that a mailed document is received three days after its mailing.  <u>See</u> ; Fed.R.Civ.6(e); <u>Baldwin County Welcome Ctr v. Brown</u>, 466 U.S. 147, 148 n.1 (1984) (per curiam).   However, the presumption can be rebutted.  <u>Id</u>. at 150 n.4.

Documents from Plaintiff's EEOC file indicate that a Notice of Rights was mailed to Plaintiff's address on March 29, 2000.  <u>Exs. U & V</u>.  Plaintiff's termination claim is untimely based on a receipt date of March 2000 and the fact that the complaint was never subsequently amended to include the termination issue.  However, a plaintiff who does not receive actual knowledge of a suit letter through no fault of his own should not be penalized.  <u>See</u> <u>Franks v. Bowman Transp. Co.</u>, 495 F.2d 398 (5th Cir. 1974).  The question here is whether Plaintiff's situation falls into such a category, or at least if there is a dispute of fact about whether he received the notice in March 2000.   If so, the statutory period can be equitably tolled. <u>See</u>, <u>e.g.</u>, <u>Biester v. Midwest Health Serv., Inc.</u>, 77 F.3d 1264, 1269 n.2 (10th Cir. 1996); <u>Million v. Frank</u>, 47 F.3d 385 (10th Cir. 1995).

Through affidavits submitted with the briefs on this issue, Plaintiff has satisfactorily rebutted the presumption that he received the notice issued by the EEOC on March 20, 2000, thereby creating a dispute of fact about whether or not his termination claim under Title VII is

time-barred.  However, I find that the issue need not be resolved, since this case would be

disposed of on the merits, as set forth below, in that Defendant would be entitled to summary

judgment on that claim.[11]

## III.    Discrimination Claims

### A.    *Legal Standard - Summary Judgment*

Summary judgment is appropriate where no genuine issues of material fact exist and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The party bearing

the burden of proof at trial on a dispositive issue must go beyond the pleadings and designate

specific facts so as to make a showing "sufficient to establish the existence of an element essential

to that party's case in order to survive summary judgment."  McKnight v. Kimberly Clark Corp.,

149 F.3d 1125, 1128 (10th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986)).

### B.    *Legal Standard - § 1981 and Title VII*

Plaintiff does not present direct evidence of intentional discrimination as to the underlying

events.  Claims of disability discrimination based on indirect evidence are reviewed under the

analytic framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93

S.Ct. 1817 (1973); Hardy v. S.F. Phosphates Limited Co., 185 F.3d 1076, 1079 (10th Cir. 1999).

 Thus, Plaintiff's Title VII claim against UNMH as well as his § 1981 claim against Sheryl Patton

---

[11]   This Court would not be divested of jurisdiction to decide the merits of the case, even if
Plaintiff's termination claim were untimely.  The 90-day time limit is not a jurisdictional
prerequisite to suit.   See St. Louis v. Alverno College, 744 F.2d 1314, 1316 (7th Cir. 1984);
accord, Neal v. IAM Local Lodge, 722 F.2d 247, 249 (5th Cir. 1984); cmp., Zipes v. Trans
World Airlines, Inc., 455 U.S. 385, 393 (1982), cited in Richardson v. Frank et al., 975 F.2d
1433, 1435 (10th Cir. 1992) (filing a timely charge of discrimination with the EEOC is not a
jurisdictional prerequisite to suit in federal court).

may be analyzed under this standard.   See Roberts v. Roadway Express, Inc., 149 F.3d 1098,

1103 (10th Cir.1998) (elements are identical for § 1981 & Title VII actions).

To assert a claim under § 1981, Plaintiff must show that Defendants intentionally or

purposefully discriminated against him.   General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,

458 U.S. 375, 391 (1982); Reynolds v. School Dist. No. 1, Denver, Colorado, 6 F.3d 1523, 1532

(10th Cir. 1995)("Section 1981 prohibits racial discrimination in 'the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship'") (quoting 42 U.S.C. § 1981).   Similarly, the

complainant in a Title VII trial must carry the initial burden under the statute of establishing a

prima facie case of racial discrimination by showing intentional discrimination based upon a

protected characteristic.   See McDonnell- Douglas, 411 U.S. at 802; Jones v. Denver, 203 F.3d

748, 752 (10th Cir.2000).

Under the McDonnell-Douglas framework, the plaintiff has the burden of articulating a

prima facie case of discrimination.   The burden of production then shifts to the employer to

articulate a legitimate nondiscriminatory reason for taking the adverse action against the plaintiff.

The burden then shifts back to the plaintiff to present evidence such that a reasonable jury could

conclude that the proffered nondiscriminatory reason for the employment action is pretextual, that

is, unworthy of belief.   Hardy, 185 F.3d at 1079-80 (quotation marks and citations omitted).   A

plaintiff alleging violations of Title VII must present either direct or indirect evidence sufficient to

show intentional discrimination.   See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th

Cir.1999).

In a prima facie case under § 1981, a plaintiff must show: (1) that the plaintiff is a member

of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and

(3) that the discrimination interfered with a protected activity as defined in § 1981 (employment,

in this case).   See Reynolds, 69 F.3d at 1532.

## C.    *Prima Facie* Case

### 1.  Retaliation Standard

At the outset, I note that although Plaintiff's case alleges disparate treatment, parties rely

on the standard used in retaliation cases, requiring an initial finding that Plaintiff was engaged in a

"protected activity."  See Mem. at 20-21; Resp. at 13; see e.g.,  Reynolds, 199 F.3d  at 1141 n.12

(10th Cir. 1999); Amro v. The Boeing Co., 232 F.3d 790, 799 (10th Cir. 2000); Kendrick v.

Penske Transportation  Serv, Inc., 220 F.3d 1220, 1234 (10th Cir. 2000).  Defendants summarily

imply that Plaintiff's grievances and arbitrations would fall into this category, but Plaintiff's briefs

do not follow this thread of analysis, nor is it at all clear that Plaintiff has alleged a retaliation

claim under either Title VII or § 1981.   Plaintiff's contentions in the Pretrial Order are premised

on disparate treatment and in his brief he describes the "gist" of his claim only in terms of

disparate treatment, Resp. at 8, 13.   However, the Complaint refers to Defendants' "retaliatory

response," Compl., ¶ 24,  although without facts to outline what could be construed as a

retaliatory component to Plaintiff's claims.

At any rate, a retaliation claim would fail at the *prima facie* level because Plaintiff cannot

demonstrate a causal connection between a protected activity and the adverse employment action

of either disciplinary action or termination.[12]   See O'Connor v. Consolidated Coin Caterers

---

[12]  In retaliation cases, a plaintiff establishes a prima facie case by showing that:  (1) she
engaged in protected opposition to discrimination;  (2) she was subject to adverse employment
action;  and (3) a causal connection exists between the protected activity and the adverse action.

Corp., 517 U.S. 308, 311-12 (1996) (citation and quotations omitted).   Plaintiff was disciplined

in March 1998, September 1998 and December 1998.   He grieved each of these actions, and filed

the first EEOC claim in December 1998.   Plaintiff was not terminated until May 1999.  None of

the grievances, or the EEOC filing was close enough in temporal proximity to justify an inference

of retaliatory motive.   See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th

Cir.1999) (citation omitted) (three-month period, standing alone, is insufficient to establish

causation).[13]   Without any additional evidence to support a retaliation claim, it fails.  See Conner

v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir.1997) (unless there is very close temporal

proximity between the protected activity and the retaliatory conduct, the plaintiff must offer

additional evidence to establish causation).

## 2.   Disparate Treatment

A  plaintiff may establish a *prima facie* case of wrongful termination by showing that: (1)

he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he

was discharged; and (4) the job was not eliminated after his discharge.[14] Nwagbologu worked at

---

See Roberts v. Roadway Express, Inc., 149 F.3d 1098, 1103 (10th Cir.1998). - from Roberts,
199 F.3d at 1141.

[13]   The second charge of discrimination Plaintiff filed with the EEOC should not be
considered for purposes of a retaliation claim, since Plaintiff was terminated before it was filed.
Coors Brewing Co.,181 F.3d at 1179 n.2 (10th Cir. 1999) (retaliatory conduct has to occur after
protected activity).

[14]   The prima facie case may also be tailored to the issue of disparate disciplinary action in
which Plaintiff must show that he was treated differently than other similarly situated non-minority
employees who violated the same rule or committed infractions of equal seriousness.  Plaintiff
must show by a preponderance of the evidence that (1) the plaintiff is a racial minority, (2) the
plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under
circumstances giving rise to an inference of racial discrimination.  See also Elmore v. Capstan,

UNMH for eighteen years.  While he concedes to committing  medication errors, he maintains

that he was qualified for employment.   He also asserts that others have committed errors but

received more favorable disciplinary actions and claimed in the second charge of discrimination

filed with the EEOC that he was "replaced by a younger, White, individual." Ex. T.  (citation

omitted).   Based on those assertions (and even though Plaintiff has not framed his case along the

appropriate legal standard), I will assume that he has made out a *prima facie* case of

discrimination based on disparate discipline and wrongful termination.   See Cone v. Longmont

United Hosp. Ass'n, 14 F.3d 526, 530 n.2 (10th Cir. 1994) (elements of a *prima facie* intentional

discrimination case are "flexible and are not to be applied rigidly"); Kenworth v. Conoco, Inc.,

979 F.2d 1462, 1469 (10th Cir 1992) ( *prima facie* case of discriminatory discharge is made out

by plaintiff's credible evidence that he continued to possess the objective qualifications he held

when he was hired, or by his own testimony that his work was satisfactory, even when disputed

by his employer, or by evidence that he had held his position for a significant period of time).[15]

**D.** **Legitimate, Non-Discriminatory Basis for Discipline and Termination**

Defendants' position is that Plaintiff failed to carry out his responsibilities as a pharmacist:

properly dispensing medications, making certain that patients received the correct dosage and

obtaining clarification from prescribing doctors when questions arose.  They point to the errors

that occurred from November to December as well as the six errors that occurred within eight

---

Inc., 58 F.3d 525, 529 (10th Cir. 1995).

[15]  In determining the sufficiency of  Nwagbologu's *prima facie* case of racial
discrimination, I may not consider Defendants' reasons for any of the disciplinary actions taken.
See Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470 (10th Cir. 1992).  Rather, that evidence is
properly considered in addressing whether those articulated reasons are legitimate or merely a
pretext for discrimination.   Id ; Thomas v. Denny's, Inc. 111 F.3d 1506 (10th Cir. 1997).

weeks, from February 2, 1999 to March 30, 1999.[16]  They also refer to documentation (e.g., memoranda acknowledging Nwagbologu's medication errors) and deposition testimony which supports their position that Plaintiff's career at UNMH was riddled not only with poor work performance but also with instances of insubordination and verbal abuse of co-workers.

Defendant Patton felt that Plaintiff approached his job "with indifference," Ex. W at 53:1-2, and that he did not accept responsibility for errors that he made.  When confronted about performance problems and errors, he "continued to pass responsibility off for his errors to someone else, refused to take the responsibility himself, was insubordinate."  Ex. W at 76:14-19. With regard to the six errors cited in the notice of contemplated dismissal, Plaintiff admitted to the first error, but also stated that he made nursing staff aware of the Chemotherapy error.  According to a written statement by nursing, however, it was they who informed Plaintiff of the error.  Ex. P at 2.  As to Plaintiff's suggestion that labels had been switched on IV bags resulting in the third, fourth and sixth errors, Patton noted that the possibility "was investigated and could not be substantiated."  Ex. P at 2.

In his written response to the fifth incident concerning monitoring Tobramycin levels in a patient in the intensive care unit, Nwagbologu claimed that he took verbal report that day from another pharmacist who told him to take levels and do nothing else, and that he would follow-up on the following day.  Patton commented on the response by noting that Plaintiff later admitted that he did not take verbal report from that pharmacist, and that the team Report Book stated that

---

[16]  In Undisputed Material Fact ¶ 8, Defendants note that "numerous complaints and disciplinary measures" were taken throughout Plaintiff's career, but that only those incidents occurring during the period relevant to Plaintiff's complaint would be discussed.  Plaintiff does not dispute this portion of ¶ 8.

Plaintiff *was* supposed to monitor the medication level.   Id.  Patton also noted that the report book contained a notation inserted at a later date by Plaintiff that he had followed up on the Tobramycin level, but that this notation was not there the morning after the incident occurred. Ex. P at 2; Ex. W at 86-87..

Similar inconsistencies surrounded Plaintiff's explanations for the earlier incidents for which he was disciplined.  For example, he responded to the allegation that he had left the pharmacy short-staffed on December 7th by saying that the other pharmacist, Larry Tannery, did not tell him he would not be in to work the next day.  According to the notice of final action, however, Tannery stated in writing that he did.  Plaintiff also said that he had completed an Absentee Form for the time off, but none was found.   Ex. M at 2,

Patton stated she received numerous complaints regarding Nwagbologu's attitude problems while she was his supervisor.  According to these complaints, Plaintiff would "become argumentative" about making medications that needed to get out and "use racial slurs to make people uncomfortable in the workplace."  Ex. W, 52:16-53:6.  Also, Patton's dim appraisal of Nwagbologu's credibility was a factor in her reluctance to accept Plaintiff's explanations for some of the medication errors, e.g., his contention that another pharmacist had mislabeled certain IV bags.[17]  Ex. W at 80:18-81:2.  Given Plaintiff's past work performance, Patton stated that she realized there would be "no change in the trend."  She started to consider Plaintiff's dismissal by

---

[17]  Patton stated that "His credibility was – the credibility of others was more substantial than Mr. Nwagbologu's credibility").  Ex. W, at 80:21-81:3.  Discounting Plaintiff's credibility is not illegal.  What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.  EEOC v. Flasher Co., Inc, 986 F.2d 1312, 1319 (10th Cir. 1992).

mid-February 1999, when Plaintiff was cited for the second of the six medication errors, but in the meantime the other four errors occurred.  Ex. W at 76:12-19.

I find that Defendants have proffered legitimate business reasons that are clearly adequate to successfully rebut the presumption of discrimination raised by the Plaintiff's *prima facie* case. Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995).  This leaves Plaintiff to prove discriminatory intent by proving that the reasons the Defendants offered are not the true reasons for the disciplinary actions and dismissal, but are merely a pretext for discrimination. Id. at 451; Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 529 (10th Cir. 1994).

**E.    *Pretext***

After establishing a *prima facie case*, at the summary judgment stage it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual -- i.e. unworthy of belief, either through direct or indirect evidence.  See Randle, 69 F.3d 441, 450 (10th Cir. 1995).  See Kendrick v. Penske Transportation Services, Inc., 220 F.3d. 1220, 1225 (10th Cir. 2000). Plaintiff attempts to establish pretext with allegations regarding Defendants' inadequate handling of the six medication errors and contentions of disciplinary disparity.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981) (evidence may be used to show both discrimination or pretext).

*1.    Perception of Performance*

Plaintiff constructs a pretext argument from his own assessment of fault and the seriousness of the medication errors.  These factors are largely irrelevant, since it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of

his own relative performance.   See Furr v. Seagate Tech. Inc., 82 F.3d 980, 988 (10th Cir.1996);

Shorter, 188 F.3d at 1207.   The pertinent question in determining pretext is whether Defendants'

belief that Nwagbologu committed the errors for which he was disciplined and dismissed was

genuine.   See Hardy v. S.F. Phosphates Ltd Co., 185 F.3d 1076, 1080 (10th Cir.1999) (pertinent

question is not whether the employer was right to think the employee engaged in misconduct, but

whether that *belief* was genuine or pretextual)(emphasis added).

The challenge of pretext requires that the facts be viewed as they appear to the person

making the decision to terminate the plaintiff, in this case, Sheryl Patton.   Shorter, 188 F.3d at

1209.   The facts indicate that Patton saw an employee who had made a string of errors within a

short time -- six errors in eight weeks, not counting previous incidents for which Plaintiff was

disciplined -- and who not only refused to accept responsibility for most of them, but who

apparently lied in an attempt to deflect fault away from himself.   Although it was unlikely that

patients were harmed as a result of the errors, Defendants were concerned that the same errors

made with different drugs could have had serious consequences and that errors could easily be

repeated where there was no acceptance of responsibility.   Ex. 7.[18]   Thus, even though I must

view the evidence most favorably to Plaintiff, see Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.

1991), the undisputed facts support Defendants' perceptions that Plaintiff had engaged in a

pattern of unprofessional and negligent behavior as well as Defendants' decision to terminate

Plaintiff.

2.    *Opportunity to Respond to Allegations of Errors*

---

[18]  Plaintiff faults Defendants for acting on their perception that he was unwilling to accept
responsibility for the errors,  yet at the same time declines to accept responsibility for all but one
of the six mistakes.  Resp. at 11-12.

As part of his argument to prove that Defendants' conduct in terminating him was pretextual,  Nwagbologu also denies having "meaningful opportunity" to discuss the third, fourth and sixth incidents as they occurred on March 6, 23 and 30, respectively.  He contends that they were not brought to his attention until some time in April, which he alleges violated hospital procedure.  <u>Nwagbologu Aff., ¶ 5</u>.   The incidents occurred on March 6, 23 and 30, respectively. Plaintiff is not contending that he had no notice or opportunity to respond to allegations of error that took place in March.  Nwagbologu concedes that he either received memos and e-mails from Patton, or met with her about the errors prior to receiving the notice of contemplated dismissal. <u>Ex. A:228:21-229:4</u>.  Rather, he argues that he was approached about the incidents later than what is required under hospital policy, although he fails to point to the provision in the policy that was violated.[19]

According to Patton, Plaintiff was approached and asked for a verbal response when each of the three errors were discovered, shortly after Patton found the IV bags on her desk.   <u>Ex. W at 77:11-22; 79:24-80:11; 89:23-90:3</u>.   Although Defendants' position on this issue appears to raise a factual dispute, I do not find it to be a dispute that involves material facts, because they do not create an inference of racial discrimination.   Moreover, I find Plaintiff's position to be internally inconsistent.   He alleges discrimination because discipline regarding the errors of March 6th, 23rd and 30th came too *late* while at the same time contends that discipline on an earlier incident (the first of the six errors on February 2, 1999) came too *early*.  <u>Resp. at 8</u>.[20]

---

[19]  The policy does contain a provision that states: "supervisors should address problems that may impact upon performance in a timely, constructive and corrective manner."  <u>Ex. F at 2</u>.

[20]  Plaintiff complains that he received a "write up" immediately after the incident that occurred on February 2, 1999, while another pharmacist who was also involved in signing off the

Evidence also shows that Plaintiff failed to respond to some of the other allegations of error when he was given the opportunity.   By May 12, 1999, his supervisor still had not received written documentation from him regarding the March 20, 1999.   Ex. O.   It took over a month for him to respond to the second incident.   Ex. W at 76:16-18.   And he never responded at all to the fifth incident involving Tobramycin.   Ex. W at 83:9-20.[21]   Nwagbologu was given 24 hours to respond to the May 12th notice of contemplated dismissal, but did not.   Ex. O, P.   Thus, Plaintiff's contentions of pretext cannot be premised on untimely notice of the March errors.

*3.    Disparate Treatment Compared to Other Individuals*

Plaintiff contends that he was treated less favorably than another pharmacist, an Anglo named Richard Roon, who committed an error in 1994 that resulted in a fatality.   Discriminatory intent can be inferred if Plaintiff can offer facts to show that he was treated less favorably than others.   See Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (in a case of disparate treatment, an "employer simply treats some people less favorably than others because of their race, color, religion" or other protected characteristics) (quoting Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)), cmp., e.g., Munoz v. St. Mary-Corwin Hospital et al.,221 F.3d 1160 (10th Cir. 2000)) (affirming summary judgment for defendant where medical resident who was terminated from residency could not show genuine dispute of material fact on issue of whether he

---

wrong chemotherapy preparation, Dennis Pena, was not issued a written counseling until July. Ex. 1.   The memo to Pena indicates that the "needed discipline was overlooked" because of a change in supervisory responsibilities.   Although the error was a first-time offense for Pena, his supervisor skipped the verbal response and issued a written counseling instead.   Ex. W at 91:6-92:6.

[21]   According to Patton, her request for a verbal response to the incident was met with a blank stare and Plaintiff walking away with forms that she had given him.   Ex. W at 83:15-20.

was treated less favorably than other residents because of his national origin or that defendants acted with discriminatory intent or motive).

In this case, Plaintiff has not presented evidence from which pretext or racial animus can be inferred.   Roon, who is color-blind, took the wrong medication off the shelf.  He was not terminated, but was disciplined with a 45-day suspension.[22]  This incident occurred approximately five years before the incidents relevant to this lawsuit.  Policy changes were made on an administrative level to reduce the possibility of this type of error from happening again.   Ex. Z Plaintiff has not established that Roon's situation can be compared with his own.  Roon's mistake was a first, to which he admitted fault, as opposed to Plaintiff's string of past errors, for most of which he declined to accept responsibility.  I do not find that these apparent inconsistencies give rise to an inference of pretext.  See Bullington v. United Air Lines, as: 186 F.3d 1301, n.15 & accompanying text (10th Cir.1999) (where court reviewed alleged inconsistencies and found them to be "insignificant at best and too minor to give rise to an inference of pretext").  Nor does Plaintiff offer any other examples where other employees were disciplined less harshly for similar types of incidents.   Thus, I find this evidence insufficient to create a dispute of fact concerning whether Defendants' actions in disciplining or terminating Plaintiff was pretextual.

_4.    Pharmacy Minutes' Report of Other Medication Errors_

Last, Plaintiff contends that the minutes of the Pharmacy and Therapeutics Committee meetings reveal a list of 184 total medication errors reported, with no actions recommended.  This list standing alone has little relevance to Plaintiff's allegations of intentional discrimination.  It

---

[22]  According to statements made by Louis Achusim, the suspension was for 45 days, not 90.  Ex. Y at 44: 5-11.  Achusim was part of management staff for the company that contracted out services to the University of New Mexico Pharmacy.

represents the universe of errors made throughout the entire hospital, by all types of healthcare practitioners, and with no notations regarding cause or fault.  Ex. AA at 12:5-12. Notwithstanding this evidence, Plaintiff has not presented any evidence which shows differences in disciplinary treatment, much less differences that could be inferred as discriminatory.

**CONCLUSION**

In an employment discrimination suit, the ultimate burden of persuading the trier of fact that a defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Burdine, 450 U.S. at 253.  Plaintiff has not satisfied this burden in any of his claims against Defendants in this lawsuit.  He has not presented evidence, either direct or circumstantial, from which a reasonable jury could infer racial animus in Defendants' disciplinary actions taken toward Plaintiff, including his dismissal.  Nor has he demonstrated that any genuine issue of material fact exists as to whether there was an unlawful motive behind these actions.

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **[docket # 54]**, is hereby GRANTED, dismissing all claims by Plaintiff against Defendants in this case with prejudice and in their entirety.

_____
UNITED STATES MAGISTRATE JUDGE